**William B. McKINNEY, Plaintiff,**

v.

**NATIONAL DAIRY COUNCIL, Defendant.**

**Civ. A. No. 75–5379–K.**

United States District Court,
D. Massachusetts.

May 28, 1980.

Edward S. Englander, Boston, Mass., for plaintiff.

Paul W. Goodrich, Morrison, Mahoney & Miller, Boston, Mass., for defendant.

## MEMORANDUM

KEETON, District Judge.

This matter is before the court on motions for judgment.

At trial four special interrogatories were submitted to the jury, and the jury answered all four favorably to plaintiff McKinney.[1] The court conferred with counsel in

---

1. The special interrogatories and their answers were as follows:

Question 1. Did the plaintiff, William B. McKinney, and the defendant, National Dairy Council, in 1953, enter into a contract, express or implied, which was in effect in 1971, under the terms of which, in the absence of cause for termination, McKinney was to work for National Dairy Council either until he died, or until the National Dairy Council ceased to exist, or until his normal retirement date (April 1, 1977), whichever occurred first?

Answer YES or NO. YES

drafting the interrogatories, and counsel agreed to the form of the special interrogatories as ultimately submitted, defendant National Dairy Council ("NDC") reserving its objection that the evidence presented no issue for jury consideration. Pursuant to its reserved objection, NDC now challenges McKinney's right to have judgment entered for him on the basis of the answers to the special interrogatories.

### I. Sufficiency of the Evidence with Respect to Question 1

In answer to the first special interrogatory, the jury found that McKinney and NDC entered into a contract "under the terms of which, in the absence of cause for termination, McKinney was to work for National Dairy Council either until he died, or until the National Dairy Council ceased to exist, or until his normal retirement date (April 1, 1977), whichever occurred first."

NDC first contends that there was insufficient evidence to support the jury's affirmative answer to this interrogatory.

The evidence adduced at trial regarding the contract between NDC and McKinney, viewed in the light most favorable to McKinney, was as follows:

1. McKinney placed a newspaper advertisement seeking employment which stated "Interested in change which would be the third and must be the last." (Plaintiff's Exhibit No. 1.)

2. NDC responded to this advertisement. (Stipulation of parties.)

3. McKinney was interviewed in New York by Mr. Milton Hult, then president of NDC. At this interview there was a general discussion of the available position and McKinney's qualifications.

4. A second meeting between McKinney and Hult occurred. In the interim McKinney had received three job offers, one of which was from the McCann-Erickson advertising agency, which had offered McKinney $1000 more per year than the maximum NDC was able to offer. At this second meeting the McCann-Erickson offer and McKinney's desire for job security were discussed. McKinney said he was primarily interested in a job that would last for the remainder of his career. Hult indicated that that was what NDC had in mind too and that the NDC job would be more stable and longer-lasting than the McCann-Erickson job.

5. McKinney accepted a position with NDC as Eastern Regional Manager.

6. In a meeting in Hult's office in 1961 in the context of a discussion of another employee's tendency to change jobs, Hult or another said something to the effect that there was no comparable concern regarding McKinney since he was there for good.

■ This evidence was sufficient to permit an inference that McKinney and NDC entered into a contract an express term of which was that McKinney was to work for NDC until his normal retirement date. There was, however, no evidence of any communication between the parties expressly about the possibility or effect of NDC's ceasing to exist or McKinney's dying before McKinney reached his normal retirement date.

When the parties have reached an agreement otherwise sufficient to constitute a contract but have had no communication regarding a matter as to which their legal

---

Question 2. Did the plaintiff, William B. McKinney, and the defendant, National Dairy Council, modify or amend the original contract in 1972, National Dairy Council offering and McKinney voluntarily accepting early retirement?

Answer YES or NO. NO

If you answered Question 2 YES, do not answer other questions.

If you answered Question 1 YES and Question 2 NO, then answer Question 3.

---

Question 3. Did the plaintiff sustain his burden of proof that the National Dairy Council committed a breach of its contract with William B. McKinney in December 1972?

Answer YES or NO. YES

Regardless of how you answered Question 1, if you answered Question 2 NO, answer Question 4.

Question 4. Was age the determining factor in the National Dairy Council's decision to terminate William B. McKinney?

Answer YES or NO. YES

rights must be determined, the missing element may be supplied either by proof of an implied-in-fact understanding between them or by operation of a rule of law. There is no evidence in the present case of an implied-in-fact understanding regarding the possibility of NDC's ceasing to exist or McKinney's dying before McKinney reached retirement age. Unless unenforceable under the statute of frauds, however, a contract for personal services is not invalidated by the absence of any express or implied agreement on these subjects. As a matter of law, in the absence of an express or implied agreement to the contrary, if either of these events occurs the period during which the employee must perform services and for which the employer must pay terminates. A distinction may be drawn, in describing the legal consequence, between determining that performance of the contract was complete upon the occurrence of one of these events and determining that further performance was excused. See Part II, *infra*. In whatever way the legal consequence is described, however, that consequence follows by operation of law and not in fulfillment of an agreement in fact, express or implied. If the rule of law that produces this conclusion is regarded as one of the terms of the contract between the parties (rather than being merely a part of the law applicable to the contract), it is a term implied in law as distinguished from one agreed upon in fact, whether expressly or impliedly.

In summary, the court concludes that the evidence was sufficient to support an affirmative answer to Question 1 since, in relation to this question, it makes no difference whether the terms of the contract dealing with the effect of McKinney's death or NDC's ceasing to exist before McKinney's normal retirement date were implied in fact or instead in law.

## II. Statute of Frauds

NDC's second contention is that the contract found by the jury in its affirmative answer to Question 1 is invalid or unenforceable under the statute of frauds.

With respect to the question whether the contract was within the statute of frauds, the distinction between terms implied in law and those implied in fact may be significant. In light of the position taken on the issues addressed in Part I, *supra*, the contract under scrutiny is an oral contract between McKinney and NDC under the express and implied-in-fact terms of which McKinney was to work for NDC until his normal retirement date, subject to such other terms as the law imposes. The affirmative answer to Question 1 cannot be taken as answering the question whether the contract is within the statute of frauds. That issue is a question of law for the court to resolve.

Two inquiries must be made: (1) Is the contract by its terms within the statute? (2) Are there sufficient written memoranda of the contract to take it outside the statute?

The parties have devoted considerable attention to the question whether the statute of frauds of Massachusetts, Illinois, or New York governs this case. As both parties recognize, the point of departure for this inquiry is *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), which indicates that a federal district court sitting in diversity is to apply the conflict of law rules of the forum state. Past this point, however, the parties do not agree.

Relying on the conflicts rule that the procedural law of the forum need never be displaced, McKinney characterizes the Massachusetts statute of frauds as procedural, citing *Townsend v. Hargraves*, 118 Mass. 325 (1875), *Emery v. Burbank*, 163 Mass. 326, 39 N.E. 1026 (1895), *Porter v. Reid*, 79 F.Supp. 898 (D.Mass.1948), and other cases, and asserts that therefore the Massachusetts statute of frauds governs in this case. The cases cited by McKinney, however, are distinguishable. In none of them was the Massachusetts statute of frauds applied to validate and enforce a contract that was invalid or unenforceable under the law of the place where it was made. Rather, the cases cited by McKinney indicate that the

Massachusetts statute of frauds does not make oral contracts invalid but merely unenforceable, and that Massachusetts courts have on occasion refused to enforce a contract valid where made if it comes within the Massachusetts statute.

██ NDC contends that the Massachusetts conflict rule is that the law of the place where the contract was made governs the issue of validity of the contract, citing *Molinar v. Western Electric Co.*, 525 F.2d 521 (1st Cir. 1975), *cert. denied*, 424 U.S. 978, 96 S.Ct. 1485, 47 L.Ed.2d 748 (1976), and *Dicker v. Klein*, 360 Mass. 735, 277 N.E.2d 514 (1972), that the contract at issue, if made at all, was made in New York, and that the New York statute of frauds therefore governs. The evidence at trial would support a finding that the contract was made in New York and would not support a finding that the contract was made elsewhere. To this extent NDC's contention is correct. However, in a case more recent than those cited by NDC the Massachusetts Supreme Judicial Court indicated

that it was ready to discard the place-of-making test and adopt a more functional approach such as "interest" analysis or the "most significant relationship" test of the Restatement (Second) of Conflict of Laws (1971). *Choate, Hall & Stewart v. SCA Services, Inc.*, 79 Mass.Adv.Sh. 1877, —— Mass. ——, 392 N.E.2d 1045 (1979). This court predicts that when squarely confronted with the issue the Supreme Judicial Court will in fact adopt "a more functional approach" to choice of law in the contracts context.[2] Although the Supreme Judicial Court might, if adopting a test of this general nature, define its details in a way different from the Restatement Second formulation, no suggestion appears in the arguments that such a variation would be material to the outcome in the present case. In considering the outcome, then, under an "interest" analysis or "most significant relationship" test, this court will turn to the formulation in the Restatement (Second) of Conflict of Laws (1971).[3]

---

**2.** Even if the old place-of-making rule were applied, the result, with respect to the issue of determining which jurisdiction's statute of frauds law would apply, would be the same. Application of the place-of-making rule would result in selection of New York law relative to the statute of frauds. As is developed immediately below, the same conclusion would follow from applying an "interest" analysis or "most significant relationship" test.

**3.** The relevant sections of the Restatement (Second) of Conflict of Laws (1971) are as follows:

§ 6 Choice-of-Law Principles
(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
 (a) the needs of the interstate and international systems,
 (b) the relevant policies of the forum,
 (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
 (d) the protection of justified expectations,
 (e) the basic policies underlying the particular field of law,
 (f) certainty, predictability and uniformity of result, and

 (g) ease in the determination and application of the law to be applied.
§ 141 Statute of Frauds
Whether a contract must be in writing, or evidenced by a writing, in order to be enforceable is determined by the law selected by application of the rules of §§ 187–188.
§ 186 Applicable Law
Issues in contract are determined by the law chosen by the parties in accordance with the rule of § 187 and otherwise by the law selected in accordance with the rule of § 188.
§ 188 Law Governing in Absence of Effective Choice by the Parties
(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.
(2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
 (a) the place of contracting,
 (b) the place of negotiation of the contract,
 (c) the place of performance,
 (d) the location of the subject matter of the contract, and
 (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

Section 141 of the Restatement Second directs that the rules of §§ 187–188 apply to the statute of frauds question. Since the parties here have not chosen the law of a particular state to govern their contractual rights and duties, § 187 is inapplicable and § 188 controls. An evaluation of the contacts enumerated in § 188(2) in this case reveals the following:

(a) place of contracting: New York

(b) place of negotiation: New York

(c) place of performance: as originally contemplated, and for first 7 years of employment, eastern United States, based in New York; subsequent transfer to Chicago, which remained base of operation for 9 years; subsequent transfer back to cover eastern United States, based in Massachusetts.

(d) location of subject matter of contract: inapplicable

(e) domicil of plaintiff: at time of contracting, New York; currently, Massachusetts; place of incorporation of defendant: Illinois.

The preponderance of these contacts is with New York. Contacts with Massachusetts (McKinney's current domicil and third base of operation) and with Illinois (NDC's place of incorporation and McKinney's second base of operation) arose, with the one exception of NDC's place of incorporation, long after the contract in question was made. Bearing in mind the factors enumerated in § (2)(d) through (f)—protection of justified expectations, basic policies underlying the field of law, and certainty, predictability, and uniformity of result—it

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

(e) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189–199 and 203.

§ 196 Contracts for the Rendition of Services
The validity of a contract for the rendition of services and the rights created thereby are determined, in the absence of an effective choice of law by the parties, by the local law of the state where the contract requires that the services, or a major portion of the services, be rendered, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.

*Comment a. Scope of section.*

\* \* \* \* \* \*

The rule applies if the major portion of the services called for by the contract is to be rendered in a single state and it is possible to identify this state at the time the contract is made. It is necessary that the contract should state where the major portion of the services is to be rendered or that this place can be inferred either from the contract's terms or from the nature of the services involved or from other circumstances. For this reason, the rule of this Section is unlikely to aid in the determination of the law governing contracts for employment aboard a ship sailing the high seas or to serve as a traveling salesman in two or more states. The same is true when the work called for by the contract can be done in any one of two or more states.

The law selected by application of the present rule determines such questions as . . . whether the contract of employment must be in writing to be binding.

*Comment b. Place where services are to be rendered.* The importance in the choice-of-law process of the place where the services, or a major portion of the services, are to be rendered depends somewhat upon the nature of the services involved. This place enjoys greatest significance when the work is to be more or less stationary and is to extend over a considerable period of time. This is true of a contract for employment on the ordinary labor force of a particular factory or of a contract with an independent contractor who will provide labor on a construction project. By way of contrast, the place where the services are to be rendered is of lesser importance when the services are to be of a relatively brief duration, such as when a workman is employed to do a minor repair job in a given state, or when the employee's duties will require him to travel with fair frequency between two or more states. Even in these latter situations, the place where the major portion of the services is to be rendered, provided that there is such a place, is the contact that will be given the greatest weight in determining, with respect to most issues, the state of the applicable law.

§ 199 Requirements of a Writing—Formalities
(1) The formalities required to make a valid contract are determined by the law selected by application of the rules of §§ 187–188.
(2) Formalities which meet the requirements of the place where the parties execute the contract will usually be acceptable.

*Comment d.* Choice-of-law questions relating to the statute of frauds are within the scope of the present rule. . . .

seems appropriate in relation to the choice of law question with respect to the statute of frauds to give greater weight to contacts in existence at the time of contracting than to contacts which arise after that time. Accordingly, counting and weighing contacts under § 188(2) leads to the conclusion that New York law governs. Because the evidence at trial would not support the inference that the contract required the services it contemplated to be rendered in any one particular state, § 188(3) and § 196 are inapplicable. Application of § 199 again points to the local law of New York as governing.

The New York statute of frauds provides in relevant part as follows:

> a. Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:
>
> 1. By its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime; . . .

N.Y.Gen.Oblig.Law § 5–701.

■■ The contract found by the jury in its answer to Question 1, as interpreted in Part I, *supra*, was made in 1953 and had as one of its terms that McKinney was to work for NDC until his normal retirement date (April 1, 1977). This agreement "[b]y its terms is not to be performed within one year from the making thereof," and is void under the New York statute "unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent." The mere fact that NDC might have ceased to exist or McKinney might have died within one year of the making of the contract does not take the contract out of the stat-

ute. *Cohen v. Bartgis Brothers Co.*, 264 A.D. 260, 35 N.Y.S.2d 206 (1942), *aff'd*, 289 N.Y. 846, 47 N.E.2d 443 (1943). If these contingencies had been express or implied-in-fact terms of the contract—and Part I, *supra*, found that there was no evidence that they were—the situation might have been different, for in that case it could be found that the full performance contemplated by the contract could have been rendered within one year of the contract's making.[4] *But see Packet Co. v. Sickles*, 72 U.S. (5 Wall.) 580, 595, 18 L.Ed. 550 (1887) (contract that steamship company would use patented device on steamship for duration of patent [more than 1 year], if boat should last that long, was within the statute; "the possibility of defeasance does not make it the less a contract not to be performed within the year"). However, termination of a contract by operation of law is not equivalent to full performance. *Zupan v. Blumberg*, 2 N.Y.2d 547, 161 N.Y.S.2d 428, 141 N.E.2d 819 (1957); *Deevy v. Porter*, 11 N.J. 594, 597, 95 A.2d 596, 597–598 (1953) ("where the oral agreement does bear a fixed term and is not to be performed within the year it is held to be within the statute even though the obligations thereunder may be terminable by operation of law well within the year; the most common illustration is an oral agreement for personal services for a fixed period exceeding one year but terminable by operation of law upon death"); *Chevalier v. Lane's, Inc.*, 147 Tex. 106, 111, 213 S.W.2d 530, 532, 6 A.L.R.2d 1045, 1050 (1948) ("where, by the terms of the oral agreement, its period is to extend beyond a year from the date of its making, the mere possibility of its termination by operation of law within the year, because of death or other fortuitous event, does not render . . . the Statute inapplicable, but . . . where the agreement may, by its own terms, be fully per-

---

**4.** It may be noted in passing that at a hearing on these matters on May 12, 1980, McKinney argued that the evidence at trial, summarized in Part I, *supra*, was sufficient to permit an inference that he and NDC entered into a contract an implied-in-fact term of which was that McKinney was to work for NDC for life. This assertion may seriously be doubted, but in any event it does not aid McKinney's position, since the New York statute applies not just to contracts not to be performed within a year but also to contracts "the performance of which is not to be completed before the end of a lifetime."

formed within the year, as, for example, [an] agreement . . . for employment during the term of a man's life, the Statute does not apply"); 2 A.L. Corbin, Contracts § 447, p. 556 (1950) ("But in service cases it is generally recognized that termination of duty by operation of law is not identical with performance of a promise. The death of a party may terminate duty; but the contemplated work has not been done. It is otherwise if the parties have themselves agreed upon the limitation as one of the terms of the agreement that created the duty."); Restatement of Contracts § 198, and in particular comment c and illustrations 2, 3, and 8 (1932); 72 Am.Jur.2d, Statute of Frauds § 15 (1974).

An essential inquiry therefore is whether McKinney has offered proof of sufficient written memoranda of the contract to take it outside the statute of frauds. McKinney points to four documents which, he asserts, taken together, do so: Plaintiff's Exhibits 4, 5, 6, and 8.

Plaintiff's Exhibit 4 is a memorandum from McKinney to Dr. Brink, president of NDC. It states in part, "Today is my 60th Birthday and marks the year in which I must earn the highest possible salery [sic] to generate maximum retirement income." Plaintiff's Exhibit 5 is a reply memorandum to McKinney from Dr. Brink which states in part as follows:

\* \* \* \* \* \*

The 1972 salaries of each and every NDC executive have been carefully considered and approved by the NDC Board Personnel Committee. Unfortunately, it has not been possible to grant you a salary increase at this time. Your salary will be reviewed again at the end of 1972 for possible increase in 1973.

\* \* \* \* \* \*

Chet Ross informs me that under the new NDC Retirement Plan an increase in salary received right up to the last year of employment will affect the amount of your retirement income. Therefore, it is not necessary for an employee to reach a maximum salary at age sixty. Under the former individual annuity plan increases received during the last five years of employment did not affect the retirement income, but this is not true under the present plan.

Plaintiff's Exhibit 6 is a letter from Dr. Brink to McKinney indicating the plans for McKinney's so-called early retirement. It indicates that McKinney's salary upon termination was $1,625 per month, that as an employee or retiree he was entitled to various insurance, health, pension, and vacation benefits, and that McKinney began working for NDC on August 10, 1953. Plaintiff's Exhibit 8 is a formally unsigned document on plain paper, dated June 1, 1972 and addressed to McKinney, which indicates "This is a statement of your participation in the Group Annuity Contract issued to the Retirement Income Plan for employees of Dairy Council." The document also indicates a normal retirement date of April 1, 1977 and contains the following statement:

*Termination of Employment:*

In the event of termination of employment prior to reaching normal retirement date you shall receive payment of your equity in cash or you may. leave it on deposit with the insurance company to improve at interest and to pay you reduced monthly income beginning at your Normal Retirement Date. ˙

These documents are at best ambiguous on the critical term of the contract in question, the promise by NDC to employ McKinney until his normal retirement date. Exhibit 8, assuming it were found to be signed by NDC or sufficiently referred to in another document signed by NDC, indicates only what McKinney's normal retirement date was, not that McKinney would be employed until that date. A projected normal retirement date may be as much an incident of an at-will employment contract as an employment contract for a term ending on the retirement date. In fact, the provision regarding termination of employment in Exhibit 8 would appear to indicate that the parties contemplated that termination of the employment relationship without a breach of contract was possible before McKinney's normal retirement date. The

provision in Exhibit 6 of certain benefits to McKinney after termination might be read as supporting an inference that NDC was attempting to compromise an otherwise continuing obligation to employ McKinney, but it might also be read merely as an indication that NDC wished to provide as generously as it could for a long-time at-will employee upon his termination. In any event, this document does not contain a specific and certain enough indication of a promise to employ McKinney until his normal retirement date to satisfy the statute of frauds. Exhibit 5 merely indicates that NDC employees were normally expected to retire at age 65.

The only potential memorandum of the contract not pointed to by McKinney which has come to the court's attention is the affidavit[5] of M. F. Brink, dated April 7, 1976, submitted in support of NDC's motion to dismiss. The affidavit contains the following statements:

> In August of 1953 the plaintiff was employed by the National Dairy Council as a Regional Manager operating from the State of New York. The plaintiff's contract of employment was oral. To my knowledge, there has never been a written contract between the plaintiff and the National Dairy Council. *It was anticipated that the plaintiff's contract of employment would last more than a year* and, in fact, the plaintiff held various positions with the National Dairy Council until December 31, 1972 when, because of an internal reorganization, there was no further need for the plaintiff's services.

(Emphasis added.) The emphasized language is ambiguous. On the one hand, it may be read to indicate that the parties entered into an employment contract of a duration greater than one year; on the other hand, it may be read to indicate that the parties entered into an at-will employment relationship which they anticipated would last more than one year. Considering the context in which NDC tendered the affidavit, it seems clear that the emphasized language was intended to support the former inference—that the contract was of more than a year's duration. Even so, the emphasized language does not indicate how much longer than one year the contract was to last; specifically, it does not indicate that NDC bound itself to employ McKinney until his normal retirement date.

These documents, taken alone or taken together, do not contain an indication of a promise to employ plaintiff until his normal retirement date certain and specific enough to satisfy the statute of frauds.

### III. Promissory Estoppel

McKinney contends that even if the contract found by the jury in its answer to Special Interrogatory 1 is within the applicable statute of frauds, the court should nevertheless enforce the contract, on the theory that "defendant should be estopped from asserting [a statute of frauds] defense by the doctrine of promissory estoppel." See Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Judgment Notwithstanding the Verdict, p. 23.

Although there may be some doubt whether McKinney's estoppel theory is viable under New York law, which, as found in Part II, *supra*, governs with respect to the long-term contract found by the jury in its answer to Special Interrogatory 1, *Kahn v. Cecelia Co.*, 40 F.Supp. 878 (S.D.N.Y.1941); *Scheuer v. Scheuer*, 308 N.Y. 447, 126 N.E.2d 555 (1955), for present purposes it may be assumed that promissory estoppel may bar application of the statute of frauds when the criteria articulated in *Philo Smith & Co. v. USLIFE Corp.*, 420 F.Supp. 1266 (S.D.N.Y.1976), aff'd, 554 F.2d 34 (2d Cir. 1977), are met. *Philo Smith* recognized, but found insufficient evidence to sustain, a promissory estoppel theory in the statute of frauds context, consisting of following elements: (1) a fraudulently made promise by the defendant; (2) upon which the defendant anticipated the plaintiff would rely; (3) reasonable reliance by the plaintiff upon

---

5. With respect to the question whether an affidavit in an action on a contract can constitute a memorandum sufficient to satisfy the statute of frauds with respect to that contract, see 2 A.L. Corbin, Contracts § 519 (1950).

the promise; and (4) substantial injury to the plaintiff as a result of the reliance. The evidence in the present case appears insufficient to support the first of these elements—that is, that NDC's promise of employment was fraudulently made. In any event, McKinney did not present his promissory estoppel theory at trial, and as a result special interrogatories directed to its requirements were not put to the jury. In the absence of appropriate findings McKinney is foreclosed from relying on this theory.[6]

### IV. Submission of Question 1 to Jury

NDC's third contention is that it was error to submit Question 1, as formulated, to the jury. In light of the disposition reached in Parts II and III, *supra*, it is not necessary to reach this issue.[7]

### V. Judgment Based on Answer to Question 3

■ NDC's fourth contention is that absent a valid and enforceable contract for a stated period, the answer of the jury to Question 3 cannot support a judgment for plaintiff. This contention is sustained. Question 3 inquired whether there was a breach of the contract referred to in Question 1. In light of the conclusion that the contract referred to in Question 1 is unen-forceable under the statute of frauds, the jury's answer to Question 3 is irrelevant.

### VI. Breach of At-Will Employment Contract

In light of the conclusion that the contract found by the jury in its answer to Question 1 is unenforceable under the New York statute of frauds, the employment relationship between McKinney and NDC was an at-will relationship.

In answer to the fourth special interrogatory, the jury found that age was the "determining factor" in NDC's decision to terminate McKinney.

NDC contends that absent a valid and enforceable contract for a stated period, the jury's affirmative answer to Question 4 cannot support judgment for the plaintiff. In other words, NDC contends that under the governing law no breach occurs when the determining factor in the decision to terminate an at-will employee is the employee's age.

### A. Massachusetts Law Applies

■ To determine the rights and obligations of the parties with respect to the termination issue it is necessary to ascertain which jurisdiction's local law governs.

Although the original agreement between the parties was made and negotiated in

---

**6.** This point applies as well to a more liberal theory of promissory estoppel than that stated in the text above. Restatement (Second) of Contracts § 217A (Rev. Tentative Draft 1973) presents what is probably the most liberal formulation of the promissory estoppel doctrine in the statute of frauds context. *See generally* Annotation, Promissory Estoppel As Basis for Avoidance of Statute of Frauds, 56 A.L.R.3d 1037 (1974). Section 217A indicates that (1) a promise (2) which the promisor should reasonably expect to induce action or forbearance on the part of the promisee, (3) and which does induce such action or forbearance, is enforceable notwithstanding the statute of frauds (4) if injustice can be avoided only by enforcement of the promise. The jury's answer to Special Interrogatory 1 may be taken as a finding that the first requirement of this formulation—the existence of a promise—was satisfied. The fourth requirement may properly be a question addressed to the court rather than the jury. Requirements 2 and 3, however, call for find-ings of fact, and thus present questions for the jury.

**7.** It should be noted, however, that defendant failed to object to the formulation of Question 1, as distinguished from contending that the evidence raised no issue for jury consideration. Moreover, even if defendant had properly preserved an objection to the form of Question 1 because of inclusion of the words "either until he died, or until the National Dairy Council ceased to exist," the objection would be without merit. Since these conditions are added by operation of law in the absence of express or implied-in-fact agreement to the contrary, omitting the quoted phrase from Question 1 would have created a risk of jury misunderstanding unless the court instructed that these conditions would be added by operation of law and that the jury should not give a negative answer because the agreement included these conditions and for that reason was on terms different from those stated in the question.

New York, these contacts have much less significance with respect to the issue of termination of an at-will relationship than they did with respect to the issue of the validity and enforceability of a long-term relationship. The place-of-performance contact points clearly to Massachusetts over New York and Illinois, the other jurisdictions the applicability of whose law has been urged or discussed. At the time of termination McKinney was based in Massachusetts and covered the eastern United States, and there has been no showing that any performance during the latter period of employment took place in Illinois or New York. McKinney was domiciled in Massachusetts at the time of the termination and NDC is an Illinois corporation. Given this constellation of contacts, it seems relatively clear that Massachusetts has the most significant relationship to the transaction and the parties with respect to the termination issue. Thus, since the principles articulated in the Restatement (Second) of Conflict of Laws are to be applied, for the reasons stated in Part II, *supra*, Massachusetts law governs.

### B. Uncertainty in the Relevant Massachusetts Law

■ The Supreme Judicial Court has recognized that a contract of employment at will may contain an implied covenant of good faith and fair dealing such that a termination not made in good faith constitutes a breach of the contract. *Fortune v. National Cash Register Co.*, 373 Mass. 96, 364 N.E.2d 1251 (1977). *Fortune* involved an at-will contract between a salesman and his employer under which the salesman was compensated by a fixed salary and a bonus for sales made within his territory. In the Superior Court the jury found, in response to special interrogatories, that the employer acted in bad faith when it decided to terminate the employee and when it terminated him, and judgment was entered for the employee. The Supreme Judicial Court affirmed the judgment of the Superior Court, ruling that the contract of employment at will contained an implied covenant of good faith and fair dealing, that a termination not made in good faith constituted a breach of the contract, and that there was sufficient evidence to support the jury's findings of bad faith, since the evidence supported an inference that the termination was motivated by a desire to pay the employee as little of the bonus credit otherwise due him as possible. Although the *Fortune* court declined to "speculate as to whether the good faith requirement is implicit in every contract for employment at will," 373 Mass. at 104, 364 N.E.2d at 1257, a fair reading of the opinion indicates that in the case at bar McKinney's at-will employment relationship with NDC contained an implied covenant of good faith and fair dealing of the type recognized in *Fortune*. The question that remains for resolution, then, is whether a termination the determining factor of which was McKinney's age constitutes a breach of the implied covenant of good faith and fair dealing.

Mass.Gen.Laws c. 149, § 24A, before amendment in 1978,[8] read as follows:

> It is hereby declared to be against public policy to dismiss from employment any person between the ages of forty-five and sixty-five, or to refuse to employ him, because of his age.

Mass.Gen.Laws c. 151B, § 4 provides in relevant part as follows:

> It shall be an unlawful practice:
>
> 1. For an employer, by himself or his agent, because of the . . . age . . . of any individual . . . to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification.

---

**8.** Stat.1978, c. 142 amended § 24A to read as follows:

Whoever dismisses from employment any person between the ages of forty-five and sixty-five, or refuses to employ such person because

29 U.S.C. § 623 provides in relevant part as follows:[9]

(a) It shall be unlawful for an employer—

(1) . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;

\*　　\*　　\*　　\*　　\*　　\*

(f) It shall not be unlawful for an employer . . .—

\*　　\*　　\*　　\*　　\*　　\*

(2) to observe the terms of a bona fide seniority system or any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this chapter, except that . . . no such seniority system or employee benefit plan shall require or permit the involuntary retirement of any individual [who is at least 40 years of age but less than 70 years of age] because of the age of such individual.

Before the decision in *Fortune*, the Supreme Judicial Court held that there was no civil remedy for a violation of Mass.G.L. c. 149, § 24A. *Johnson v. United States Steel Corp.*, 348 Mass. 168, 202 N.E.2d 816 (1964). In *Johnson*, the plaintiff had filed an amended declaration four counts of which alleged as follows: (1) that he had been employed by the defendant as a superintendent; (2) that he was discharged at age 63 without cause, in violation of Mass.G.L. c. 149, § 24A; (3) that the discharge was done with the intention of depriving him of certain benefits; and (4) that there was work available for him which he was capable of performing. The trial court sustained the defendant's demurrer to these counts. After indicating that "[t]he sufficiency of [the counts] depends on whether

G.L. c. 149, § 24A, gives the plaintiff a civil remedy," 348 Mass. at 169, 202 N.E.2d at 817, the court held that the demurrer was properly sustained:

The defendant's duty not to discharge the plaintiff before he had reached the age of sixty-five is solely the creature of statute; no such duty exists at common law. The only basis for holding the defendant liable is the statute. But that does not expressly provide a civil remedy. Nor does it appear that such a remedy was intended by "clear implication."

348 Mass. at 170, 202 N.E.2d at 818.

Although the *Johnson* court focused upon the propriety of implying a civil cause of action for violation of the statute, it also clearly implied that the statute does not augment common law rights in such a way that a violation of the statute could give rise to a cause of action for breach of contract. Moreover, the reasoning of the *Johnson* court would also seem clearly to preclude the implication of an independent cause of action, or the augmentation of common law rights, based on violations of Mass.G.L. c. 151B, § 4 or 29 U.S.C. § 628, which contain their own remedial schemes.

In light of *Fortune*, would the Massachusetts court reach a result in the present case contrary to the result in *Johnson*?

This issue having been identified during oral argument on the motions of the parties following verdict, submissions of the parties were invited as to whether the procedure for certification of controlling, unsettled issues of state law should be used in this instance.[10] No request for certification has been filed, however, and in the circumstances of this case it seems appropriate for the court, rather than itself taking the initiative in certification, to decide the case in accordance with its best judgment as to how this unsettled issue of Massachusetts law will be resolved.

of his age, shall be punished by a fine of not more than five hundred dollars.

**9.** The last clause of 29 U.S.C. § 623(f)(2) was added by Pub.L. 95–256, § 2(a), 92 Stat. 189, April 6, 1978.

**10.** See Supreme Judicial Court Rule 3:21, 359 Mass. 787 (1971), *as amended*, 366 Mass. 853, 871 (1974).

There are strong arguments against finding a cause of action in these circumstances. Two of the three statutes mentioned above are part of comprehensive legislative schemes which contain express remedial provisions. Mass.Gen.Laws c. 151B, §§ 5, 6, and 9; 29 U.S.C. § 626. The third is part of a legislative scheme that provides no civil remedy but that may have provided for a fine at the time in question.[11] Mass.Gen. Laws c. 149, § 180. *Johnson v. United States Steel Corp.*, 348 Mass. 168, 202 N.E.2d 816 (1964).

The remedial schemes condition the relief they grant upon compliance with certain requirements, such as timely filing of a complaint and submission of a complaint to an administrative agency. These statutory prerequisites to relief would be circumvented by the recognition of a cause of action for breach of contract based on a violation of the policy the statutes enunciate. Moreover, it may reasonably be argued that the remedial schemes would have been unnecessary had the statutes manifested an intent that they augment common law rights. The remedial schemes are the product of the respective legislatures' weighing and balancing of competing concerns of employer and employee. Courts should not lightly undertake action that would alter the balance the legislatures have struck.

Considerations such as these have led other courts to decline to recognize causes of action in circumstances similar to the case at bar. Thus, in *Wehr v. Burroughs Corp.*, 438 F.Supp. 1052 (E.D.Pa.1977), *judgment affirmed, with modification, in appeal on other grounds* (3d Cir., April 16, 1980), the court, although recognizing that the Pennsylvania Human Relations Act, 43 P.S. §§ 951 *et seq.*, "manifests a clear policy favoring elimination of age discrimination in employment," declined to recognize a cause of action for breach of an at-will employment contract when the contract was terminated on the basis of age contrary to the policy enunciated in the statute. The

court felt that the statutory remedial scheme sufficiently vindicated the policy goals in question:

A finding that certain conduct contravenes public policy is not enough in itself to warrant the creation of a contract remedy for wrongful dismissal by an employer. The cases which have established a tort or contract remedy for employees discharged for reasons violative of public policy have relied upon the fact that in the context of their case the employee was otherwise without remedy and that permitting the discharge to go unredressed would leave a valuable social policy to go unvindicated.

\* \* \* \* \* \*

It is clear then that the whole rationale undergirding the public policy exception is the vindication or the protection of certain strong policies of the community. If these policies or goals are preserved by other remedies, then the public policy is sufficiently served. Therefore, application of the public policy exception requires two factors: (1) that the discharge violates some well-established public policy; and (2) that there be no remedy to protect the interest of the aggrieved employee or society.

438 F.Supp. at 1054, 1055. The court in *Bonham v. Dresser Industries, Inc.*, 569 F.2d 187 (3d Cir.), *cert. denied*, 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978), reached the same conclusion:

In the instant case, Pennsylvania's public policy on the question of arbitrary age discrimination is manifest. A termination based on age would violate the duties imposed on employers by the Pennsylvania Human Relations Act and would trigger the remedies provided by that act. We conclude that the Pennsylvania courts would not hold that termination of an at-will employee on the basis of age gives rise to an independent breach of contract in addition to those statutory remedies. We do not believe that the courts of

---

11. Mass.Gen.Laws c. 149, § 24A now itself expressly provides for a fine for its violation. See note 8, *supra.*

Pennsylvania would hold that the mere passage of the Human Relations Act created a separate common law claim where none had existed before, and where that void had been filled by that very legislation. Judicial reluctance to create such a remedy is evident in *Geary* [*v. United States Steel Corp.*, 456 Pa. 171, 319 A.2d 174 (1974)] and we believe that the courts of Pennsylvania, if directly confronted with the issue, would hold that the Pennsylvania Human Relations Act and the procedures established therein provide the exclusive state remedy for vindication of the right to be free from discrimination based on age.

569 F.2d at 195 (footnote omitted).

On the other hand, courts in several jurisdictions have recognized causes of action, in tort or in contract, for termination of at-will employment relationships when the termination was on grounds that violated public policy. *E. g., Petermann v. International Brotherhood of Teamsters*, 174 Cal. App.2d 184, 344 P.2d 25 (1959) (termination for refusal to commit perjury); *Montalvo v. Zamora*, 7 Cal.App.3d 69, 86 Cal.Rptr. 401 (1970) (termination for designating attorney to represent employee for purpose of negotiating terms and conditions of employment); *Frampton v. Central Indiana Gas Co.*, 260 Ind. 249, 297 N.E.2d 425, 63 A.L. R.3d 973 (1973) (termination for filing workmen's compensation claim); *Monge v. Beebe Rubber Co.*, 114 N.H. 130, 316 A.2d 549, 62 A.L.R.3d 264 (1974) (termination motivated by bad faith or malice or based on retaliation); *Ness v. Hocks*, 272 Or. 210, 536 P.2d 512 (1975) (termination for serving on jury); *Reuther v. Fowler & Williams, Inc.*, 255 Pa.Super. 28, 386 A.2d 119 (1978) (termination for serving on jury); *Perks v. Firestone Tire & Rubber*, 611 F.2d 1363 (3d Cir. 1979) (Pennsylvania law) (termination for refusal to submit to polygraph test; state statute provided that it was misde-

meanor to require as condition of employment that person take polygraph test). *Cf. Geary v. United States Steel Corp.*, 456 Pa. 171, 319 A.2d 174 (1974) (recognizing potential cause of action but refusing to find one on facts there presented). At least one court has recognized such a cause of action where the termination was based on age, contrary to public policy as declared in a state statute. *McGinley v. Burroughs Corp.*, 407 F.Supp. 903 (E.D.Pa.1975) (Pennsylvania law).[12]

The three statutes mentioned above, Mass.Gen.Laws c. 149, § 24A, Mass.Gen. Laws c. 151B, § 4, and 29 U.S.C. § 623, clearly enunciate a public policy against discrimination in employment on the basis of age. It is but a short step to conclude that an action which violates such a clear public policy is a breach of an implied covenant of good faith and fair dealing. Since Massachusetts law, as well as federal law, plainly manifests a public policy against age discrimination in employment, it would be a striking limitation of the scope of the implied covenant if it were held inapplicable to a decision to terminate because of age. Moreover, it would be extraordinarily difficult to defend in principle a distinction that treats the covenant of good faith and fair dealing as applying, at least potentially, to other termination decisions generally but not to those based on age discrimination.

There is no basis for believing that this issue emerged for explicit consideration before the Massachusetts legislature, or in the *Johnson* case since that case arose before the seminal decision in *Fortune*. In these circumstances it seems inappropriate to attribute to the Massachusetts legislature, or to the *Johnson* court, or to the combination of their actions, a prescription that makes this distinction decisive. Rather, it is a more defensible reading of Massachusetts law as having taken a new turn in *Fortune*, which for the first time recognized an im-

12. The decision of the district court in *McGinley*, however, has been undermined by a subsequent decision of the Court of Appeals for the Third Circuit, which disapproves the *McGinley* court's interpretation of Pennsylvania law. *Bonham v. Dresser Industries, Inc.*, 569 F.2d 187 (3d Cir. 1978), *cert. denied*, 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113. *See also Wehr v. Burroughs*, 438 F.Supp. 1052 (E.D.Pa.1977), *judgment affirmed with modification in appeal on other grounds* (3d Cir., April 16, 1980).

plied-in-law term of an at-will employment contract requiring good faith and fair dealing with respect to a decision to terminate the employment. That change in the law of contracts materially altered one of the basic premises that might reasonably have been taken for granted when *Johnson* was presented for decision—the assumption that no claim could be established unless a civil remedy was found to be implied in the statute.

It is true, of course, that in this resolution of a very close issue the public policy against age discrimination manifested in the statute is a factor. But it is factor in a way quite different from that urged and rejected in *Johnson*. Here, the force of the analogy to the statute moves in confluence with the greater flow of the principles and policies underlying the implied covenant of good faith and fair dealing, first recognized in *Fortune*. Consistently with the common law tradition, the court in *Fortune* left the scope of the emerging doctrine to be charted in future cases. Whatever the ultimate scope of the doctrine may be, however, undisputed elements of the factual background of the present case present a compelling basis for application of the implied covenant of good faith and fair dealing in this instance. McKinney's newspaper advertisement, which initiated the parties' dealings with each other, declared his interest in a "change which would be the third and must be the last." See Part I, *supra*. Even though the relationship was in the eyes of the law an at-will employment, by reason of the statute of frauds (see Parts II and III, *supra*), by December, 1972 it had continued for more than 19 years, and

McKinney had reached the age of 60. Unless the Massachusetts court were to adopt an absolute bar against treating termination because of age as a breach of the implied covenant of good faith and fair dealing, a case of such facts as these will surely be found to be within the scope of the covenant.

On balance, then, this court concludes that under the law of Massachusetts NDC's decision, in which McKinney's age was the determining factor, to terminate the at-will employment of the 60-year-old plaintiff, after 19 years of service, violated the implied obligation of good faith and fair dealing.

## VII. Voluntary Retirement

NDC's final contention is that as a matter of law McKinney voluntarily retired and is therefore barred from recovery on any contract of employment he may have had with NDC.

The issue of voluntary retirement was submitted to the jury in Special Interrogatory 2. Special Interrogatory 2 and its answer read as follows:

> Did the plaintiff, William B. McKinney, and the defendant, National Dairy Council, modify or amend the original contract in 1972, National Dairy Council offering and McKinney voluntarily accepting early retirement?
>
> Answer YES or NO. Answer: <u>NO</u>

The jury were instructed that if they found that McKinney, though choosing to accept the proposal for early retirement, made that choice under duress, they should answer this question "No." McKinney had the burden of proving duress. To prove duress he had to prove that his will was overborne by bad faith action by NDC.[13]

---

**13.** The instruction to the jury with respect to Question 2 was as follows:

Question 2 asks: "Did the plaintiff, William B. McKinney and the defendant, National Dairy Council, modify or amend the original contract in 1972, National Dairy Council offering and McKinney voluntarily accepting early retirement?"

If an employer and an employee desire to do so they may modify the contract between them. Also, if they in good faith have different views about what each owes the other, and they voluntarily enter into an agreement resolving their differences, the law enforces that new agree-

ment. If you find that the defendant has met its burden of proof, showing, by a preponderance of the evidence, that William B. McKinney and National Dairy Council desired to modify the contract between them or had different views about what each owed the other and that they both chose to and did enter into a new agreement, you will answer Question 2 YES, unless you find that the choice made by the plaintiff, McKinney, was made under duress, as I will define duress in a moment.

If, on the other hand, you find that Mr. McKinney, though choosing to accept the proposal for early retirement, made that choice

*Cf. Molinar v. Western Electric Co.,* 525 F.2d 521, 530 (1st Cir. 1975) (New York law) ("for [the employee's] resignation to be treated as coerced and legally ineffective, it must be shown not only that the projected discharge would amount to a legal breach of contract but that there was bad faith, in that [the employer] knew or believed that the discharge could not be substantiated"), *cert. denied,* 424 U.S. 978, 96 S.Ct. 1485, 47 L.Ed.2d 748 (1976).

 Contrary to NDC's assertion, there was sufficient evidence from which the jury could infer that McKinney made a choice to accept early retirement under duress. Assuming the undisputed testimony of the short notice McKinney received to appear at the NDC office in Chicago, the somewhat different descriptions in testimony of what occurred when McKinney appeared, and the nature of the written documentation of the alleged voluntary retirement, the jury could reasonably find that the reasons stated to McKinney were different from the reasons NDC decided to call McKinney to Chicago for the purpose of consummating his early retirement and that McKinney's will was overborne by bad faith representations of the employer. The jury could reasonably find, under the evidence, that NDC's suggestion of concern that McKinney held views about NDC's future that differed sharply from views of board members and officers was not a genuine reason for the NDC decision and, instead, McKinney's age was the determining factor.

## VIII. Conclusion

At trial the parties stipulated that in the event of a finding on liability in favor of McKinney, damages should be awarded in the amount of $94,080.

Judgment on the verdict, together with the stipulation regarding damages, will be entered for plaintiff McKinney.

---

under duress—as I will define duress in a moment—then you will answer Question 2 NO. The burden of proving duress by a preponderance of the evidence is upon the plaintiff, McKinney.

An employee will have proved duress, as that term is used in this context, if the employee proves that his will was overborne by bad faith action by the employer. To do so, he must prove two things. First, the employee must prove that the employer knew or believed that a determining factor in its reasons for the proposed early retirement could not be substantiated, or, though representing that it was taking a position consistent with the contract between them and consistent with the law applicable to their contract, knew or believed that it was taking a position that was contrary to their contract or to the law applicable to their contract. Second, the employee must prove that he would not have entered into the new agreement but for the employer's bad faith representation.