STATE OF MAINE                          SUPERIOR COURT
PENOBSCOT, ss.                          CIVIL ACTION
                                        DOCKET NO. CV-09-145
                                        Kmc - PEN - 12/24/2012

SUNBURY PRIMARY CARE, P.A.,
d/b/a SUNBURY FAMILY MEDICINE,
P.A.,

            Plaintiff,

      v.                                **DECISION AND ORDER**

SUSAN STEVENS, D.O.,

            Defendant,

Before the Court is Plaintiff, Sunbury Family
Medicine's ("Sunbury") complaint alleging (1) breach of
contract and (2) unjust enrichment. Defendant, Susan
Stevens, counterclaims for (1) breach of contract and (2)
constructive discharge. Dr. Stevens' breach of contract
claim asserts breach through a violation of the public
policy on gender discrimination and calls upon the Court to
adopt the implied covenant of good faith and fair dealing
in the at-will employment context. The Court declines to do
so. This case was tried to the Court on March 21, 2012.
After considering the party's respective arguments, both
written and oral, and the record before the Court including
the trial transcript, judgment is entered for Dr. Stevens
in the amount of $10,000 for conversion of personal
property.

                          BACKGROUND

After trial and consideration of the record evidence
before it, in the context of the time frame presented the
Court finds the following factual narrative to be true:
Sunbury Primary Care, P.A., d/b/a Sunbury Family
Medicine, is a medical practice located in Bangor, Maine,
with multiple offices in the surrounding area. The practice
included the following doctors: Dr. Bruehl, Dr. Simone, Dr.
Hayward, Dr. Smith, Dr. Stevens, and Dr. Curtis. In May of
2002, Sunbury hired David Savell as Chief Executive
Officer. Mr. Savell brought with him an aggressive
management style that several doctors found to be abrasive
and degrading. His approach to management resulted in a
division of ownership into voting blocs, with the dominant
bloc controlling the direction of the medical practice.  It

1

also resulted in centralization of power within the organization to the exclusion of smaller, less profitable offices. He altered the financial metrics presented to ownership so that it became more complex and difficult to understand for the doctors, and the increasing the financial strain on smaller offices by reallocating expenses between the various offices. Over time, a divide formed within the practice and a majority-voting block consisting of Doctors Breuhl, Simone, and Hayward (30 shares total) formed against Doctors Smith, Stevens, and Curtis (25 shares total). It is in this environment that the present claims arose.

Discord developed over time in 2005 and thereafter on a number of fronts including Mr. Savell's management style and the kind and amount of understandable information that was shared with the shareholders by Mr. Savell. The discord became focused in 2007 when Sunbury shareholders were asked by Key Bank to personally guarantee existing loans from Key Bank. Dr. Stevens declined to sign the guarantee because she was concerned with the way that Sunbury was being managed, including concerns over the number of lawsuits against the organization and what she viewed as human rights violations.[1] Additionally, the majority-voting block sought to open a new office in Hermon, but the minority-voting members all believed that this would undercut Dr. Stevens business at the Carmel office because of the geographic proximity of the two locations.[2] Around this same period, Mr. Savell began to treat Dr. Stevens poorly in front of her colleagues, and made disparaging comments about her productivity.[3] Mr. Savell opined that Dr. Stevens

---

[1] The record does not reflect that Dr. Stevens made these particular concerns known to the other owners or Mr. Savell.
[2] That expansion had the potential for undercutting Dr. Stevens Carmel practice and there were proposals to and about Dr. Stevens's business interests, how they would be affected and how she could be compensated for that risk. Dr. Stevens did not respond or make concrete counter-proposals, dragging out consideration of this expansion. There were also questions of whether she would be the Director of a Hermon Division and what entity would own the Hermon building. It turned out, about the time Dr. Stevens left, that the original business entity that was to own the Hermon building in which she had an interest was put aside and a new entity was formed in which several shareholders and Mr. Savell had an interest wound up owning the Hermon building.
[3] Dr. Smith also presented testimony to the Court, whether true or not, that Mr. Savell told others on multiple occasions that he did not believe that women were good managers and on at least one occasion that he wanted an "alpha male" running the Carmel

2

should not be benefiting from the profit earning abilities of Nurse Practitioner Darla Coombs, who worked in the Carmel office.[4] Mr. Savell informed Dr. Smith that Darla Coombs would be transferring from the Carmel office and instructed him to keep that information confidential. During this time period, the majority-voting block and Mr. Savell held at least one secret meeting before a normally scheduled board meeting to discuss Dr. Stevens and how best to get rid of her.[5]

In January of 2008, Ms. Coombs, the only other income-producing individual in the Carmel office, tendered her resignation to Dr. Stevens, despite the absence of any past complaints. Sunbury mailed a letter to its clients on March 6, 2008, informing them that while Ms. Coombs had proposed leaving Sunbury, it had renegotiated her contract and she would be moving to the Hampden office effective March 31, 2008, and later would move to the newly opened Hermon office effective August 2008. Ms. Coombs departure from the Carmel Office reduced the total revenue projections for the Carmel office from $777,192 to $545,007, a total difference of $232,185. Ms. Coombs also took patients with her to the Hampden Office.

That same January, Mr. Savell sent an email to Dr. Stevens proposing to cut her pay from $180,000 to $69,200 based on his new profitability analysis of the Carmel office.[6] On January 28, 2008, Dr. Stevens responded to Mr. Savell by informing him that his proposed budget was "unacceptable," and asking him to reevaluation the budget based on proposed savings she intended to implement. On February 13, 2008, Mr. Savell informed Dr. Stevens that her proposed cuts would bring her salary to $105,000 and that she would have to provide more services in order to reach her desired salary of $180,000. Mr. Savell informed Dr. Stevens in that same email that her proposed budget cuts would have to be implemented by February 25, 2008. On February 25, 2008, at 5:01 PM, Mr. Savell wrote Dr. Stevens

---

office. These comments are the basis for Dr. Stevens' gender discrimination claim. The Court does not address whether these statements were in fact made because it finds that no gender discrimination may be brought in this case as a matter of law.

[4] This statement was made to both Dr. Smith and Dr. Curtis, and during board meetings.

[5] Dr. Stevens walked in on the secret meeting by chance but she was instructed to leave by Mr. Savell and Dr. Hayward, and on the way out, Dr. Simone said, "let's get on with this, what weapons do we have against Dr. Stevens."

[6] Dr. Stevens' employment contract set her salary according to an income over expense formula.

informing her that that because the proposed budget cuts had not been accomplished by her, her base compensation would be $69,200.

On February 29, 2008, Dr. Stevens tendered her resignation (effective May 29, 2008). Following the resignation, Mr. Savell took over management of the Carmel office, fired the office manager, and sent other essential employees to different Sunbury offices. This, coupled with the departure of Darla Coombs, resulted in grossly decreased profits the last three months that Dr. Stevens worked at Sunbury. After her resignation, Sunbury relinquished the building the Carmel office was located in back to Dr. Stevens pursuant to their lease. All of the minority block doctors have since left Sunbury. Mr. Savell purchased Dr. Stevens shares in Sunbury Real Estate, LLC.

## DISCUSSION

A. Sunbury's Breach of Contract Claim

The parties do not dispute the existence of a valid contract; but rather, both assert that the contract was breached. The Court first turns to Sunbury's breach of contract claim, which alleges that Dr. Stevens owes $52,824 pursuant to her employment agreement. Sunbury also alleges unjust enrichment in this same context. Dr. Stevens counters with the argument that Sunbury's numbers are "bogus."

Sunbury claims $52,824 under the provision of Section 2(a) of the employment agreement, which provides that referenced Exhibit A governs compensation. Under Exhibit A, Dr. Stevens was permitted to make regular draws of estimated compensation payments equaling no more than 85% of her estimated annual compensation. At the end of each calendar year, or upon the termination of the Doctor's employment, the Doctor was required to refund Sunbury the excess amount drawn. Sunbury asserts that all of the $52,824 paid to Dr. Stevens in 2008 during the four months she worked was overdrawn. Under this theory, Dr. Stevens earned no income for four months of work.

To arrive at this conclusion, Sunbury utilized a formula that was devised by Mr. Savell to determine the actual annual compensation of each doctor. Mr. Savell calculated Dr. Stevens' actual annual compensation entitlement for 2008 as $69,200, an adjustment he made from Dr. Stevens 2007 income of $180,000.[7] Mr. Savell's rationale

---

[7] Dr. Stevens challenged this determination while still employed with Sunbury and asked that Mr. Savell provide her with a

4

for making this change stemmed from the departure of Darla Coombs from the Carmel office, resulting in a one-third revenue reduction for that office. In addition, Mr. Savell's formula considered the total income earned by the Carmel office during the months Dr. Stevens was still employed at Sunbury. This total income was, however, impacted greatly not only by the loss of Darla Coombs, but also because Mr. Savell, acting as *de facto* Carmel Division Manager, removed multiple essential employees and patient files from the practice immediately after Dr. Stevens tendered her resignation. At trial, Mr. Savell admitted on cross-examination that his formula was inaccurate and Plaintiff subsequently submitted an amended number, though absent any convincing basis for reaching that number.

Sunbury has the burden of proving to the Court that Dr. Stevens owes them money for overdraws. Sunbury presented evidence of the formula it used to calculate the amount it claims through the testimony of Mr. Savell. The Court found Mr. Savell's testimony to be unreliable. The cross-examination pointed out deficiencies in Mr. Savell's proposed formula. The Court also found Mr. Savell to be disingenuous in making statements about his conduct toward Dr. Stevens. Along a similar thread, the Court was provided insufficient evidence, even using Mr. Savell's formula, that Dr. Stevens was paid the amount Sunbury now claims. Because Sunbury has failed to satisfy its burden by presenting credible evidence of Dr. Stevens' alleged overdraws, the Court grants judgment for Dr. Stevens on Plaintiff's contract claim.

B. Dr. Stevens' Breach of Contract Claim

*a. Gender Discrimination*

The Court must reject at the outset the proposition that gender discrimination supports Dr. Stevens' claim for breach of her employment contract. The Maine Human Rights Act ("MHRA") prohibits the discrimination or discharge of an employee on the basis of sex. 5 M.R.S. § 4572(1)(A) (It is unlawful employment discrimination . . . for an employer to . . . discharge an employee or discriminate with respect to . . . promotion, [] compensation, terms, conditions, or privileges of employment [for discriminatory reasons based

---

calculation of how she could achieve a salary of $180,000. Mr. Savell made calculations based on her proposals, which brought Dr. Stevens' annual salary to $105,000. However, her salary was decreased to $69,200 shortly thereafter and Dr. Stevens resigned four days later.

on sex]"). In the typical case, a party bringing a cause of action arising under the Maine Human Rights Act must first file a complaint with the Maine Human Rights Commission to be entitled to money damages or attorney fees. *See* 5 M.R.S. § 4622. Absent such a filing, the claim is moot because the Court cannot provide relief on the claim. *Gordan v. Cummings*, 2000 ME 68, ¶ 11, 756 A.2d 942.

Here, Dr. Stevens did not pursue her gender discrimination claim through the Maine Human Rights Commission. Nor does she file this claim under the MHRA. Instead, the object of Dr. Stevens' contention is to show a violation of public policy in support of her breach of contract claim. The presentation of a gender discrimination claim in this context is no more than a veiled attempt to apply the doctrine of implied covenant of good faith and fair dealing, which the Law Court has previously declined to apply to at-will employment contracts. *Bard v. Bath Iron Works Corp.*, 590 A.2d 152, 156 (Me. 1991). That doctrine, implies terms of good faith into the agreement where none are expressly written, and originates not only from public policy concerns, but also from the theory that a silent agreement is nonetheless, "instinct with . . . an obligation,' imperfectly expressed," to perform in good faith. *McCall Co. v. Wright*, 133 A.D. 62, 68 (N.Y. 1909)(*Cardozo, J.*) The inclusion of a good faith requirement here would be inapposite to the common law doctrine of at-will employment, which by its own terms, permits a party to terminate a relationship without cause, and even negligently and in bad faith. *Demars v. General Dynamics Corp.*, 779 F.2d 95, 100-01 (1st Cir. 1985). The only conceivable circumstances under which the doctrine might apply to an at-will employment contract is where the discharge occurs in violation of a statutorily created public policy for which there is no civil remedy available, or where the employer seeks to deprive the employee of previously earned compensation. *Bard v. Bath Iron Works Corp.*, 590 A.2d 152, 156 (Me. 1991) (citing *McKinney v. National Dairy Council*, 491 F. Supp. 1108, 1118-22 (D. Mass 1980)). That is certainly not the case here, where the MHRA provides a civil remedy for the wrong alleged. Therefore, Dr. Stevens may not attempt to bring that same claim through breach of contract.

### b. Bad Faith

Dr. Stevens remaining arguments appear to arise from the malicious nature of Mr. Savell and the majority-voting block's conduct toward her; namely, strategizing to oust

her from the business, luring her nurse practitioner away from her practice, lowering her salary, and opening another office a mere 5 miles from her Carmel office. While this conduct was egregious and in bad faith, such conduct is not enough to find a breach of an at-will employment contract. *Larrabee v. Penobscot Frozen Foods, Inc.*, 486 A.2d 97, 99 (Me. 1984). Sunbury's obligation to act in good faith and to treat Dr. Stevens fairly was governed by the employment agreement. That agreement expressly permits termination without cause by either party and implies no good faith requirement. As there is no cognizable basis for Dr. Stevens' breach of contract claim, the Court grants judgment to Sunbury on this claim.

## C. Constructive Discharge

Constructive discharge is not a separate cause of action that may be alleged independent of proof of some other form of unlawful conduct giving rise to the termination. *Levesque v. Androscoggin County*, 2012 ME 114, ¶ 6, __ A.3d ___. Thus, as counterclaim plaintiff, Dr. Stevens must allege a companion cause of action to prevail on such a claim. Here, Dr. Stevens argues breach of an employment contract, which is a valid companion action to an action for constructive discharge. *Jeanes v. Allied Life Ins. Co.*, 300 F.3d 938, 942 (8th Cir. Iowa 2002) (constructive discharge may be brought with a breach of contract claim); *See Levesque*, 2012 ME 114, ¶ 7, ___ A.3d ___ (doctrine of constructive discharge originated in labor law context). However, Dr. Stevens' constructive discharge claim fails as a matter of law because she has not prevailed on her breach of contract claim. *Levesque*, 2012 ME 114, ¶ 6, __ A.3d at __.

## D. Damage to Personal Property

Dr. Stevens also claims monetary damages for the conversion of her property, which was located at the Carmel office and take by Sunbury at the time that she resigned.[8] Dr. Stevens provided credible testimony on the issue of ownership, value, and removal by Sunbury. The Court finds this testimony convincing and therefore awards Dr. Stevens $10,000 for the loss of her personal property.

The entry is:

---

[8] Dr. Stevens still owns the building that the Carmel office was in, and had leased the building to Sunbury.

7

1. Judgment for the Defendant, Dr. Stevens, on Plaintiff's claims of breach of contract and unjust enrichment.

2. Judgment for Counterclaim Defendant, Sunbury, on Counterclaim Plaintiff's claims of breach of contract and constructive discharge.

3. Judgment for the Counterclaim Plaintiff, Dr. Stevens, in the amount of $10,000, plus interest, for conversion of personal property.

2. At the direction of the Court, this Order shall be incorporated into the docket by reference pursuant to M.R. Civ. P. 79.

Dated: December 24, 2012

_____
Kevin M. Cuddy
Justice, Superior Court

8

---------------------------------------------------------------------------

| SEQ | Title | Name | | BCR | ATT |
|-----|-------|------|--|-----|-----|
| 001 | PL | SUNBURY PRIMARY CARE P A | Neal Pratt Esg | | T |
| 002 | DEF | SUSAN STEVENS DO | Eugene Coughlin Esg | / / | T |