JOSEPH MADDALONI vs. WESTERN MASS. BUS LINES, INC.

Hampden.  November 13, 1979. — July 10, 1981.

Present: HALE, C.J., GOODMAN, & GRANT, JJ.

*Contract*, Performance and breach, Employment. *Damages*, Employment contract.

A written contract for employment at will, which provided that the employee, who had substantial experience in dealing with the Interstate Commerce Commission, would receive compensation, in addition to a weekly salary, if the employer bus company were able to obtain a grant of interstate charter rights from the ICC, contained an implied covenant of good faith which was breached when the employee was discharged shortly after the company had acquired the charter rights and after the employee had insisted on receiving the additional compensation over his employer's protests. [237-244]

An employee who was discharged in breach of the covenant of good faith implied in a written contract for employment at will and who sued on the contract for the benefit of his bargain was entitled to recover as damages the amount of the commissions he could reasonably have been expected to earn under the contract [245-248], as well as the wages and benefits to which he would have been entitled but for the discharge [248-249].

CIVIL ACTION commenced in the Superior Court on August 21, 1974.

The case was tried before *Griffin*, J.

*Donald A. Beaudry* for the plaintiff.

*William F. Lally* for the defendant.

GOODMAN, J.  These are cross appeals from a judgment after a trial by jury awarding damages to the plaintiff, Maddaloni, for breach of a contract under which the plaintiff was employed by the defendant (WMBL) as general manager and which, as is undisputed,[1] was terminable at will.

---

[1] The jury were so instructed with the acquiescence of both parties.

Contrast *Garrity* v. *Valley View Nursing Home, Inc.,* 10 Mass. App. Ct. 822 (1980). The jury were instructed that they might find such a breach if the defendant terminated the plaintiff's employment in bad faith. The issues in this case thus depend on the applicability of *Fortune* v. *National Cash Register Co.,* 373 Mass. 96 (1977).[2]


## DEFENDANT'S APPEAL


The defendant moved for a directed verdict after both parties had rested. We set out the evidence in its aspect most favorable to the plaintiff to determine " '[i]f upon any reasonable view of the evidence there is found any combination of circumstances from which a rational inference may be drawn in favor of the plaintiff . . . .' *Howes* v. *Kelman,* 326 Mass. 696, 696-697 (1951)." *Fortune* v. *National Cash Register Co.,* 373 Mass. at 106. The plaintiff was hired by WMBL as general manager in April of 1964. Prior to that time he had worked for another bus company, Peter Pan Bus Lines, where his duties included getting new operating authorities for his employer, preparing the information and making up the necessary exhibits introduced as evidence at various hearings. He appeared as a witness for the company when it was the applicant or when it was the favoring carrier, the opposing carrier, or a party in interest. While with the Peter Pan Bus Lines, by which he had been employed a total of twenty-eight years, he had appeared before

---

[2] This case has attracted a great deal of attention and evoked much discussion. See Glendon & Lev, Changes in the Bonding of the Employment Relationship: An Essay on the New Property, 20 B.C.L. Rev. 457 (1979); Employment Contracts — Implied Covenant of Good Faith, 64 Mass.L.Q. 241 (1977); Note, Protecting At Will Employees Against Wrongful Discharge: The Duty to Terminate Only in Good Faith, 93 Harv. L. Rev. 1816 (1980). See also Olsen, Wrongful Discharge Claims Raised By At Will Employees: A New Legal Concern for Employers, 32 Lab. L.J. 265 (1981), collecting a great number of cases.

the Department of Public Utilities (DPU) and the Interstate Commerce Commission (ICC) at least fifty times.

Maddaloni was hired by WMBL primarily because John F. Fortier, then its president, was interested in obtaining a grant of interstate charter rights from the ICC. These ICC rights would permit WMBL to transport groups to points outside Massachusetts; WMBL already had intrastate charter rights for transportation within Massachusetts. Interstate charter rights are considered the best income-producing rights that any carrier could receive. Besides dealing with the ICC, Maddaloni's duties included arranging the operating schedule, soliciting and advertising for and quoting prices on charter trips, preparing the billing, checking employee time cards, and generally overseeing the entire operation.

About six weeks after Maddaloni was hired, a written employment contract was executed by Maddaloni and WMBL. It provided that Maddaloni serve as a general manager and that he be compensated as set out in the margin.[3] No definite term was mentioned.

WMBL obtained ICC charter rights in June, 1966, and the plaintiff received the payments called for in paragraph 3c of the contract (see n.3) for five and one-half months.

---

[3] "3. The Employer agrees to compensate the Employee as follows:

a. The same as presently paid, namely, $120.00 per week. In addition, Blue Cross and Blue Shield monthly insurance cost for the Employee will be paid by the Employer.
b. Any additional weekly compensation to that mentioned in paragraph 3a will rest with the Employer.
c. Immediately after the grant of Inter-state Charter Rights to the Employer by the Interstate Commerce Commission, the Employer further agrees to compensate the Employee, at the rate of 5% commission of the total Special and Charter revenue income as reported to the Massachusetts Department of Public Utilities and the Interstate Commerce Commission. This 5% commission compensation will be paid to the Employee by the Employer each month, namely, on the 15th day of each month, of the total Special and Charter revenue income received by the Employer for the past month."

In late 1966, however, the grant of ICC rights to WMBL was held erroneous by the United States District Court for the District of Massachusetts and was revoked. The payments under paragraph 3c thereupon ceased.

In September, 1970, Fortier sold his 75% of WMBL stock (the other 25% was owned by the corporation) to Mario Cantalini, who became its president; the plaintiff remained as general manager. The plaintiff had several conversations with Cantalini during the period that he was buying the business and afterwards concerning "transportation matters." In October or November of 1970, the plaintiff met with Cantalini and attorney Abraham Feinstein, apparently WMBL's lawyer, at Cantalini's office in Springfield.[4] There they discussed the need for obtaining interstate charter rights from the ICC. Cantalini and Feinstein asked various questions with reference to the applications, and the plaintiff explained the procedures to them. Cantalini then told Feinstein, who had picked up applications for filing with the ICC, to give the applications to the plaintiff. Cantalini then took out the plaintiff's employment agreement and gave it to Feinstein, who read it, returned it to Cantalini, and said, as the plaintiff testified, "[T]his would be all right with the company."

Thereafter, the plaintiff and Cantalini took two or three trips to Washington to hire counsel. The plaintiff obtained all the evidence to be included in affidavits prepared by counsel for presentation to the ICC. He canvassed schools (e.g., Smith College) and other organizations (e.g., a Golden Age Club) which he knew would be interested in using interstate services as they became available. He also sought the support of various local officials and local political bodies.

On October 1, 1973, WMBL was again granted ICC charter rights, and began operating under those rights. About a week or so later, Maddaloni and Cantalini had a

---

[4] Cantalini had various interests besides WMBL and maintained his office at his Ford dealership in Springfield.

conversation about the forthcoming payments under paragraph 3c of the contract. The plaintiff testified that he told Cantalini, "[N]ow that we had received the operating authority from the ICC, . . . that portion of my agreement on the commission was now in effect." Cantalini replied that he didn't understand it to be that way, but that he would check the agreement. On November 7 or 8, as a matter of routine, comparable charter figures for the month of October, 1973, and the month of October, 1972, were sent to Cantalini. Thereafter, on November 14, 1973, a day before the plaintiff's payment under paragraph 3c of the contract was due for October, Cantalini telephoned him and asked him if he had to pay the 5% commission for the month of October, 1973. Maddaloni testified that he "told him [Cantalini] that yes that was in accordance with the agreement he had accepted." Cantalini replied "that it was a lot of money, that it was cream off the top." Cantalini sought to postpone the matter. Maddaloni replied, "We are not going to talk about it later because tomorrow is the day that I am supposed to be paid and I am going to tell the girl to make out a check so that I will get my commission."[5] The last thing Cantalini said was "all right" and hung up. Beside the payment for October, the plaintiff received checks on December 15 and January 15 for the months of November and December, respectively. He was fired on January 19, 1974. He testified that Cantalini said that he was responsible for the poor profit statement that was inhibiting Cantalini's attempt to sell the company "and beside you wanted to get paid the commission under the agreement you made with Jack [Fortier]."[6] Maddaloni also produced figures from reports to the DPU indicating profits for the years 1970 through 1976.

---

[5] The checks were signed by a secretary and countersigned by Maddaloni. Cantalini testified that the plaintiff "told me he was going to take it [the commission]. I told him I didn't think he should."

[6] Cantalini testified that he fired the plaintiff because all he talked about was himself, his raise and retirement.

From the evidence as set out above, the jury could have found facts which bring this case within *Fortune.* Maddaloni, like the plaintiff in *Fortune,* participated in obtaining a substantial benefit — ICC rights — for his employer, contributing his expertise. For this his contract provided, in addition to a weekly salary, compensation based on revenue from charter rights while the ICC rights were in effect. The plaintiff knew, of course, when he entered into the contract, that his employment could be terminated. He had a right to assume, however, that the employer would not exercise his prerogative "to avoid the payment of compensation attributable to past services." *Cheney* v. *Automatic Sprinkler Corp.,* 377 Mass. 141, 148 (1979).[7] Thus, in *Fortune,* the Supreme Judicial Court "held that an employer may not in bad faith discharge an employee, employed at will, so as to prevent the employee from earning commissions which would have been payable in the normal course." *Cheney,* 377 Mass. at 148-149. *Dunn* v. *Holladay,* 6 Mass. App. Ct. 842 (1978) (cause of action stated where complaint alleged the defendant insurance company "induced annuitants to replace annuity contracts generated by the plaintiff [an agent] with new ones for the purpose of causing the plaintiff to lose 'persistency' commissions and service fees on the replaced contracts"). *Hoefel* v. *Atlas Tack Corp.,* 581 F.2d 1, 6 (1st Cir. 1978), cert. denied sub nom. *Atlas Tack Corp.* v. *Mahoney,* 440 U.S. 913 (1979). *McKinney* v. *National Dairy Council,* 491 F.Supp. 1108, 1121-1122 (D. Mass. 1980). Cf. *Zapatha* v. *Dairy Mart, Inc.,* 381 Mass. 284, 299-300 (1980); *Wilson* v. *Brookline Housing Authy.,* 383 Mass. 878 (1981);

---

[7] The jury were instructed that if they found that "the firing was primarily to deprive him of commissions which were to have been paid to him," they would return a verdict for the plaintiff. The use of the word "primarily" was perhaps more favorable to the defendant than was required. See *Malloy* v. *Coldwater Seafood Corp.,* 338 Mass. 554, 562-563 (1959); *RLM Assoc.* v. *Carter Mfg. Co.,* 356 Mass. 718 (1969); *Fortune,* 373 Mass. at 105, 106.

*A. John Cohen Ins. Agency, Inc.* v. *Middlesex Ins. Co.*, 8 Mass. App. Ct. 178, 182-183 (1979). Whatever the reason for termination, Maddaloni could reasonably expect that it would not be the evasion of payments based on the plaintiff's past services. "Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." Restatement (Second) of Contracts § 205, Comment a (1981). Implicit in the very concept of a contract as a meeting of the minds for a common purpose is the principle that "in every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing." *Druker* v. *Roland Wm. Jutras Assoc.*, 370 Mass. 383, 385 (1976). *A. John Cohen Ins. Agency, Inc.* v. *Middlesex Ins. Co.*, 8 Mass. App. Ct. at 182. See also *Sechrest* v. *Safiol*, 383 Mass. 568, 569-571 (1981).

The court in *Fortune* refused to speculate whether there might be situations where no such covenant of good faith would be implied (*Fortune*, 373 Mass. at 104); but we see no difference in principle between the contract in *Fortune* and this contract in which the plaintiff's reasonable expectation that in the normal course he would get what he had earned was frustrated. Burton, Breach of Contract and the Common Law Duty to Perform in Good Faith, 94 Harv. L. Rev. 369, 389 (1980) ("contract law generally . . . presum[es] that the parties expect future events to proceed in a normal course and expect each other to behave, absent express terms, in accordance with customary practices of trade" [footnote omitted]). See *McKinney* v. *National Dairy Council*, 491 F. Supp. at 1121-1122, where the court pointed out that *Fortune* "for the first time recognized an

implied-in-law term of an at-will employment contract re-
quiring good faith and fair dealing with respect to a decision
to terminate the employment," and held that the covenant
was broken when the plaintiff was fired because of his age,
contrary to public policy.

The defendant's argument that *Fortune* should be con-
fined to "commissions" as defined in the fourth edition of
Black's Law Dictionary[8] is not persuasive. *Fortune*, itself,
deals with what the court termed variously "commissions,"
"bonuses," "bonus commissions," and "bonus credits." *For-
tune*, 373 Mass. at 97, 99, 105. Indeed, Fortune's contract
provided for a "bonus for sales made within the 'territory'
. . . whether the sale was made by him or someone else"
(footnote omitted). *Id.* at 97.[9] *Fortune*, at 105, points as
an analogy to examples of contracts including bonuses
(*Coleman* v. *Graybar Elec. Co.*, 195 F.2d 374 [5th Cir.
1952]; *Sinnett* v. *Hie Food Prod., Inc.*, 185 Neb. 221,
222-224 [1970][10]), and stock options (*Lemmon* v. *Cedar
Point, Inc.*, 406 F.2d 94, 96-97 [6th Cir. 1969]; *Zimmer* v.
*Wells Management Corp.*, 348 F. Supp. 540, 542 [S.D.N.Y.
1972][11]). The situation in this case especially calls for the

---

[8] "The recompense or reward of an agent . . . calculated as a percent-
age on the amount of his transactions or on the profit to the principal."
Black's Law Dictionary 339 (4th rev. ed. 1968). However, the definition
goes on to say: "But the term may mean simply a compensation . . . and
does not necessarily imply a mere per centum valuation . . . ." *Id.* The
new edition defines "commissions" as "[t]he compensation or reward paid
to a factor, broker, agent, salesman, . . . etc., *usually* calculated as a
percentage on the amount of his transactions or the amount received or
expended" (emphasis supplied). Black's Law Dictionary 247 (5th rev. ed.
1979). See *National Paper & Cordage Co.* v. *Atlantic Carton Corp.*, 332
Mass. 651, 653-654 (1955).

[9] See *Thompson* v. *Miller*, 251 Iowa 324, 327 (1960), in which "com-
missions" on the sale of hitch pins were awarded on the basis of a contract
awarding a percentage of the sale of "every hitch pin . . . regardless of
how, or who it is sold to."

[10] See also *Thompson* v. *Burr*, 269 Or. 329, 334-335 (1971).

[11] See also *Coats* v. *General Motors Corp.*, 3 Cal. App. 2d 340, 348
(1934); *Ebling* v. *Masco Corp.*, 79 Mich. App. 531, 534-535 (1977), aff'd

implication of a covenant of good faith. The contract provided for enhanced compensation to Maddaloni upon the acquisition of ICC rights deemed advantageous by the employer who, in turn, after reaping the benefits, discharged Maddaloni just as he was about to receive the reward for his achievement.

The defendant also argues that there is insufficient evidence that the plaintiff was fired in bad faith for the purpose of depriving him of the fruits of his endeavors. This argument is unpersuasive. Cantalini's protestations when the payments under paragraph 3c became due and his discharge of the plaintiff when he insisted on taking his commissions were sufficient for the jury to find a purpose to deprive him of those commissions. The jury were not required to believe that Maddaloni was fired for legitimate business reasons; the question was for the jury. *Fortune*, 373 Mass. at 106. *Toussaint* v. *Blue Cross & Blue Shield*, 408 Mich. 579, 622 (1980).[12] *Petermann* v. *International Bhd. of Teamsters Local 396*, 174 Cal. App. 2d 184, 189 (1959).[13]

---

sub nom. *Toussaint* v. *Blue Cross & Shield*, 408 Mich. 579 (1980).

See also the line of cases, each of which relies on the reasoning in *Fortune*, holding that an employer could not in bad faith deprive an employee of retirement benefits. *Hoefel* v. *Atlas Tack Corp.*, 581 F.2d at 6 (company could not rely on contract language to revoke pensions of already retired employees). *Savodnik* v. *Korvettes, Inc.*, 488 F. Supp. 822, 825-826 (E.D.N.Y. 1980) (allegation of discharge to avoid vesting of pension benefits stated cause of action in tort under New York law).

[12] In that case, the court said: "Where the employer alleges that the employee was discharged for one reason — excessive tardiness — and the employee presents evidence that he was really discharged for another reason — because he was making too much money in commissions — the question also is one of fact for the jury. The jury is always permitted to determine the employer's true reason for discharging the employee" (footnote omitted). *Toussaint* v. *Blue Cross & Blue Shield*, 408 Mich. at 622.

[13] The defendant argues that uncorroborated testimony by a plaintiff may lead to fictitious claims. The short answer to that is that "the

The defendant also claims that even if bad faith were demonstrated, the plaintiff was in any event not entitled to damages. We shall discuss the question of damages in connection with the plaintiff's appeal.

### PLAINTIFF'S APPEAL

The jury were instructed that if they found that the plaintiff had been discharged in bad faith, they should, in determining damages, answer two questions. Mass. R. Civ. P. 49(b), 365 Mass. 813 (1974).[14] The jury found that the amount of commissions that the plaintiff could reasonably be expected to earn during his employment was $61,000 and that the part attributable to the plaintiff's work was $28,000. The judge then entered judgment in the amount of $28,000. We agree with the plaintiff that this was error.

---

possibility of trivial or fictitious claims does not justify denial of recovery to the victim." *Boyle* v. *Wenk*, 378 Mass. 592, 597 (1979). *Dziokonski* v. *Babineau*, 375 Mass. 555, 566 (1978), and cases cited. The defendant points to no case in which competency depended on corroboration. See G. L. c. 233, § 20. Even in a criminal case, a defendant may be convicted on the uncorroborated evidence of an accomplice. *Commonwealth* v. *Watkins*, 377 Mass. 385, 388-390, cert. denied, 442 U.S. 932 (1979). In any event, the plaintiff's testimony was corroborated by the timing of the discharge and the existence of the contract, which were undisputed. Ultimately, the issue was one of credibility for the jury.

[14] The interrogatories asked: "1. If the plaintiff had not been discharged, what do you find is the fair amount of commissions that he could reasonably be expected to earn during his employment by the defendant 'at the rate of 5% commission of the total Special and Charter revenue income as reported to the Massachusetts Department of Public Utilities and the Interstate Commerce Commission' after January 19, 1974?

"2. Of the amount that you have found in answer to Question #1, what part is attributable to Mr. Maddaloni's work and efforts in obtaining charter business for Western Mass. Bus Lines, Inc.?"

The plaintiff asked that similar interrogatories be submitted to the jury with reference to damages for loss of wages and fringe benefits. The court refused, and the plaintiff excepted. The plaintiff also submitted a request for instruction to the jury on such damages. The court refused to give such an instruction, and the plaintiff duly excepted. See Rule 49(a), 365 Mass. 812 (1974).

The trial judge gave no reasons why she entered judgment for the lower amount. Compensation for "Mr. Maddaloni's work and efforts in obtaining charter business" (see n.14, question #2) permitted recovery essentially on a quantum meruit theory. But this is not a case "where the party furnishing services and materials, finding the contract is broken by the other party, disaffirms the contract." *Fay, Spofford & Thorndike, Inc.* v. *Massachusetts Port Authy.*, 7 Mass. App. Ct. 336, 341 (1979). Here, the plaintiff did not disaffirm the contract. Rather, he chose to sue on the contract for the benefit of his bargain. 12 Williston, Contracts § 1459, at 78-81 (3d ed. 1970). "The law protects the 'expectation interest' of the person who has made a favorable contract and has abided by it." *Kass* v. *Todd*, 362 Mass. 169, 174 (1972). The plaintiff was thus entitled to $61,000, which amount the jury found would be due in accordance with question #1 (see n.14), which tracks paragraph 3c of the contract.

The defendant argues in its appeal that this jury finding was based on speculation. We think not. The plaintiff testified to the payments he received under paragraph 3c for the months of June through November, 1966, and for the months of October, November, and December of 1973.[15] He testified without objection that the value of his payments for one year would be $6,969.08. He also read into the record the defendant's charter income from 1970 to 1976 from WMBL's annual reports to the DPU, which also contained a breakdown of the charter business. Further, the plaintiff was, at the time of his discharge, fifty-nine years old and testified, without objection, that he had expected to retire at sixty-five and had so told Cantalini. See *McKinney* v. *National Dairy Council*, 491 F. Supp. at 1115.

In the circumstances of this case, it was for the trier of fact to estimate the commissions which the plaintiff could

---

[15] The monthly commissions in 1966 were $75.45, $283.45, $314.80, $270.73, $529.87, and $439.03. In 1973, the commissions were $976.55, $467.63, and $280.19.

reasonably be expected to earn in the normal course of his employment,[16] and how long he could be expected to keep his job.[17] The matter is summed up in *Cutter* v. *Gillette*, 163 Mass. 95, 97 (1895), a contract action tried before the expiration of the contract term. The court rejected the argument that it was impossible for the jury to assess damages for the unexpired portion at the time of trial; the court said, "In estimating his damages the jury have the right to consider the wages which he would have earned under the contract, the probability whether his life and that of the defendant would continue to the end of the contract period, whether the plaintiff's working ability would continue, and any other uncertainties growing out of the terms of the contract, as well as the likelihood that the plaintiff would be able to earn money in order work during the time. But it is not the law that damages which may be larger or smaller because of such uncertainties are not recoverable. The same kind of difficulty is encountered in the assessment of damages for personal injuries. All the elements which bear upon the matters involved in the prognostication are to be

---

[16] *Cutter* v. *Gillette*, 163 Mass. 95, 97 (1895). *Randall* v. *Peerless Motor Car Co.*, 212 Mass. 352, 379-382 (1912). *Barry* v. *New York Holding & Constr. Co.*, 226 Mass. 14, 18-19 (1917). *Carlo Bianchi & Co.* v. *Builders' Equip. & Supplies Co.*, 347 Mass. 636, 646 (1964) ("The amount of damages seldom can be proved with the exactness of mathematical demonstration. Much must be left to estimate and judgment, sometimes upon meager evidence"). *Air Technology Corp.* v. *General Elec. Co.*, 347 Mass. 613, 627 (1964) ("A reasonable approximation will suffice").

[17] See *Drzewiecki* v. *H & R Block, Inc.*, 24 Cal. App. 3d 695, 705 (1972), involving a contract for an indefinite term which could be terminated only for cause, in which "[t]he [trial] judge . . . took into consideration respondent's 'physical condition, his age, his propensity for hard work, his expertise in managing defendants' offices, the profit history of his operation, the foreseeability of the continued future demand for tax return service to small taxpayers' and determined that it was reasonably certain that respondent would have competently and profitably performed his managerial services for an additional 10 years after the contract was wrongfully terminated." See also *Rabago-Alvarez* v. *Dart Indus., Inc.*, 55 Cal. App. 3d 91, 97 (1976).

considered by the jury, and from the evidence in each case they are to form an opinion . . . ."[18] *Id.*

We agree with the plaintiff that his damages for breach of the good faith covenant in the contract are not confined to commissions.[19]  See note 14.  The dispute in this case which led to the plaintiff's discharge was occasioned by the commission clause in the contract; that being the case, when the defendant repudiated the contract in violation of the covenant, the plaintiff was entitled to the "fruits of his contract."  These comprised not only the value of his commissions, but the value of his job, an asset which has been characterized as the most valuable thing most employees possess.  Glendon & Lev, Changes in the Bonding of the Employment Relationship:  An Essay on the New Property, 20 B.C.L. Rev. 457, 474 (1979).  This article also makes the point that "changes in the common law regarding employment contracts are part of a 'growing recognition of the centrality of work in a person's life.'"  *Id.*, quoting Note, Implied Contract Rights to Job Security, 26 Stan. L. Rev. 335, 339 (1974).

Further, damages for future wages are implicit in cases which hold that a violation of public policy constitutes a breach of a covenant of good faith in an at will employment contract.  See *McKinney* v. *National Dairy Council*, 491 F. Supp. at 1121-1123; *Petermann* v. *International Bhd. of Teamsters Local 396*, 174 Cal. App. 2d at 188-190; *Monge* v. *Beebe Rubber Co.*, 114 N.H. 130 (1974); *O'Sullivan* v. *Mallon*, 160 N.J. Super. 416, 417-418 (1978).  Otherwise, these cases would provide no remedy and no deterrent.[20]

---

[18] The defendant in the portion of his brief on the issue of damages makes various assertions, many of which do not rise to the level of argument.  However that may be, we believe that they have all been answered in this opinion.

[19] There was evidence of the plaintiff's wages and the value of his fringe benefits.

[20] Other cases have allowed recovery in a tort action for violation of public policies constituting an abusive discharge from employment at will.  In such cases, damages for lost wages are obviously part of the

We thus apply the well-settled measure of damages for contracts generally. "An employee discharged in breach of contract may . . . sue as for a total breach, and recover the earnings which would have accrued to the employee for the full term of the contract, subject to be reduced by any earnings which the defendant shows that the plaintiff earned, or could have earned, in other employment." McCormick, Damages § 158(b) (1935). *John Hetherington & Sons* v. *Wiliam Firth Co.*, 210 Mass. 8, 21 (1911). *Dickson* v. *Riverside Iron Works, Inc.*, 6 Mass. App. Ct. 53, 57 (1978). Accordingly, the issue of the plaintiff's damages for lost wages and fringe benefits should have been submitted to the jury.

---

remedy. See *Perks* v. *Firestone Tire & Rubber Co.*, 611 F.2d 1363, 1366 (3d Cir. 1979) (discharge for refusal to take polygraph test); *Tameny* v. *Atlantic Richfield Co.*, 27 Cal. 3d 167, 174-179 & n.11 (1980) (discharge for refusing to participate in criminal activity); *Kelsay* v. *Motorola, Inc.*, 74 Ill. 2d 172, 181-186 (1978) (discharge for filing workmen's compensation claim); *Palmateer* v. *International Harvester Co.*, 85 Ill. 2d 124, 131-132 (1981) (discharge for aiding law enforcement officials in investigation of fellow employee); *Frampton* v. *Central Indiana Gas Co.*, 260 Ind. 249, 251-253 (1973) (workmen's compensation); *Lally* v. *Copygraphics*, 85 N.J. 668, 670-671 (1981) (workmen's compensation); *Nees* v. *Hocks*, 272 Or. 210, 211, 218-219 (1975) (discharge for serving on jury); *Harless* v. *First Natl. Bank*,    W.Va.    ,    -    (1978) (246 S.E.2d 270, 272-275 [W. Va. 1978]) (discharge for attempt to enforce employer compliance with consumer credit laws). See also cases collected in *Savodnik* v. *Korvettes, Inc.*, 488 F. Supp. at 825 n.3.

See *Buckley & Scott Util., Inc.* v. *Petroleum Heat & Power Co.*, 313 Mass. 498, 504-505 (1943), where the court raised the question whether damages for breach of a contract in bad faith might be as extensive as those for the tortious interference with a contract by a third person. See also *Fortune*, 373 Mass. at 102. Recent California decisions, following *Tameny*, recognize "a cause of action for wrongful discharge that sounds in both contract and in tort." *Cleary* v. *American Airlines, Inc.*, 111 Cal. App. 3d 443, 456 (1980). There is an interesting parallel between the relation of contract and tort in this context and the relation of breach of warranty and tort as explained in *Swartz* v. *General Motors Corp.*, 375 Mass. 628, 629-631 (1978).

### CONCLUSION

We therefore vacate the judgment and remand the case to the Superior Court for further proceedings to determine the amount (if any) of damages for loss of wages and fringe benefits,[21] which amount shall be added to the $61,000, to which the plaintiff is entitled in accordance with this opinion.

*So ordered.*

---

[21] There is no basis for punitive damages which the plaintiff also requests.